IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SYLVIA GEAR, MALEKEH K. HAKAMI, PATRICIA GINTER, CLAIRE WHELAN, WISCONSIN ALLIANCE FOR RETIRED AMERICANS, LEAGUE OF WOMEN VOTERS OF WISCONSIN,<br><br>Plaintiffs,<br><br>v.<br><br>DEAN KNUDSON, JULIE M. GLANCEY, ROBERT F. SPINDELL, JR., MARK L. THOMSEN, ANN S. JACOBS, MARGE BOSTELMANN, in their official capacity as members of the Wisconsin Election Commission, MEAGAN WOLFE, in her official capacity as the Administrator of the Wisconsin Elections Commission,<br><br>Defendants. | No. 3:20-cv-00278 |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

Just fourteen days before the April 7, 2020 elections in Wisconsin and just nine days before the deadline to request a mail-in absentee ballot, Governor Tony Evers and Secretary of Health Services Andrea Palm issued Emergency Order No. 12. PFOF No. 11. The "Safer at Home" Order, which took effect the next day on March 25, 2020 and will remain in effect for at least a month as the state government fights to slow the spread of COVID-19. The "Safer at Home" Order requires Wisconsinites to stay at home, with limited exceptions for essential activities such as grocery shopping, essential businesses, occupations, and governmental functions, closes all nonessential businesses, and bans gatherings with people outside one's household or living unit, again with limited exceptions. PFOF No. 11. Emergency Order #12 did not explain how its

1

provisions would interact with any of the state's many requirements for voting, such as the witnessing requirement for mail-in absentee ballots at issue in this action. PFOF No. 11; Wis. Stat. § 6.87(4)(b)1.

Meanwhile, countless eligible Wisconsin voters under self-quarantine, including Plaintiffs Sylvia Gear, Dr. Malekeh K. Hakami, Patricia Ginter, and Claire Whelan, have requested and, in many cases, already received mail-in absentee ballots because the COVID-19 pandemic prevents them from safely casting a ballot in person. PFOF Nos. 22, 23, & 25. When the ballot arrives in the mail, voters will read the instructions and realize that they need an adult U.S. citizen to serve as a witness and sign the mail-in ballot certification. Those voters who live alone or without an adult U.S. citizen in the household simply cannot safely obtain a witness signature; indeed, such a gathering with a person outside the voter's household would violate the express language of Emergency Order #12 and endanger both the voter and witness. PFOF No. 11. These voters are self-quarantining and isolating themselves to the maximum extent possible, consistent with federal and state government recommendations and mandates, including Emergency Order #12. PFOF Nos. 6 & 11. In Plaintiffs' cases, their age and medical history render them highly vulnerable to severe, possibly fatal, cases of COVID-19. PFOF Nos. 6, 22 & 23. Their self-quarantine is all the more vital, because it not only reduces the transmission of the novel coronavirus but gives Plaintiffs their best chance of survival. PFOF Nos. 6 & 7.

The witnessing requirement for mail-in absentee ballots was not intended to be a suicide pact. The legislators who enacted it could never have foreseen that it would one day force voters to act against the express, urgent directives of public health officials and put themselves in serious danger in order to exercise that most fundamental right of citizenship in a democracy, the right to vote. In an attempt to help elderly and other at-risk voters who live alone or otherwise do not have

an adult U.S. citizen to witness their mail-in ballots, certain clerks' offices are referring these desperate voters to the hotlines of non-profit organizations like the League of Women Voters of Dane County. PFOF No. 18. The witnessing requirement imposes enormous burdens on these voters' rights under the First and Fourteenth Amendments and will, absent relief from this Court, result in mass disenfranchisement. On the other side of the scales, presumably Defendants will point to their interest in preventing fraud. But while that interest is important generally, the witnessing requirement itself is an incredibly weak anti-fraud tool, and in these extraordinary, unprecedented circumstances involving a fast-spreading, highly lethal pandemic, voters' rights respectfully should be found to outweigh the need to enforce a technical and borderline ineffectual requirement.[1]

Plaintiffs Sylvia Gear, Dr. Malekeh K. Hakami, Patricia Ginter, Claire Whelan, Wisconsin Alliance for Retired Americans ("Wisconsin Alliance"), and League of Women Voters of Wisconsin ("LWVWI") (collectively, "Plaintiffs") respectfully move this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a temporary restraining order and a preliminary injunction, enjoining Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing Wis. Stat. § 6.87(4)(b)1. and from rejecting and refusing to count mail-in absentee ballots for lack of a witness signature on the absentee ballot certification envelope. Because the election is just ten days away and mail-in absentee ballots must be received by the close of the polls on Election Day, Wis. Stat. § 6.87(6), a

---

[1] Unsurprisingly, only 11 states, including Wisconsin, still require all mail-in absentee voters, not just those who require assistance, to secure a witness's or notary's signature on a mail-in absentee ballot. *See* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15-220, 7-15-230; Va. Code Ann. §§ 24.2-706, 24.2-707; Wis. Stat. § 6.87(4)(b)1.

3

temporary restraining order is essential here to allow voters to submit their ballots. Countless Wisconsin voters who live alone or without an adult U.S. citizen in the household have already received their mail-in absentee ballots and are quite literally caught between their life and their liberty. Forcing voters to choose between safeguarding their health and safety and exercising their right to vote unduly burdens their voting rights in violation of the First and Fourteenth Amendments to the U.S. Constitution.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 65(b), a court may issue a temporary restraining order without notice to Defendants if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b). "Where the adverse party has received notice of a motion for a temporary restraining order and a hearing has been held on the motion, it is proper for the court to consider the motion as one for a preliminary injunction." *Milwaukee Cty. Pavers Ass'n v. Fielder*, 707 F. Supp. 1016, 1018 n.3 (W.D. Wis. 1989); *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 963 F. Supp. 2d 858, 865 (W.D. Wis. 2013). "[T]he same showing is required to obtain either" a temporary restraining order or a preliminary injunction. *Van Hollen*, 963 F. Supp. 2d at 865 (citing *Winnig v. Sellen*, 731 F. Supp. 2d 855, 857 (W.D. Wis. 2011)). "'To win a preliminary injunction, a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits.'" *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011)). "If the moving party makes this threshold showing, the court 'weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the

nonmoving party or the public is sufficiently weighty that the injunction should be denied.'" *Id*. (quoting *Ezell*, 651 F.3d at 694). This Court "applies a sliding scale in weighing whether preliminary relief is warranted." *Van Hollen*, 963 F. Supp. 2d at 864. "[T]he more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while supporting some preliminary relief." *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009).

## ARGUMENT

### A. Plaintiffs are likely to succeed on the merits of their undue burden claim.

Plaintiffs are likely to succeed on the merits of their *Anderson-Burdick* claim. Under the circumstances of this pandemic and with Emergency Order #12 in place, the witnessing requirement for mail-in absentee voters, Wis. Stat. § 6.87(4)(b)1., constitutes an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution.

Under the First and Fourteenth Amendments to the U.S. Constitution, any burden on the right to vote must be balanced against a state's interest in that requirement. The Supreme Court has set forth the following test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson*, 460 U.S., at 788, 103 S.Ct., at 1569–1570; *see also id*., at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9.

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also One Wisconsin Institute, Inc. v. Thomsen*, 15-cv-324-jdp, 2016 WL 4059222 at *3 (W.D. Wis. July 29, 2016) ("This analysis proceeds under what is known as the *Anderson–Burdick* framework, which sets out a three-step analysis. First, I

5

determine the extent of the burden imposed by the challenged provision. Second, I evaluate the interest that the state offers to justify that burden. Third, I judge whether the interest justifies the burden.").

All of the information about COVID-19 made publicly available by government agencies like the Centers for Disease Control and Prevention ("CDC") demonstrates the unique circumstances and burdens the pandemic has created for Wisconsin's voters and election systems. Every state and the District of Columbia has reported confirmed cases of infection. PFOF No. 2. Over 85,000 cases have been confirmed in the United States, and over 1,200 patients have died. PFOF No. 2. In Wisconsin, 842 confirmed cases and 13 deaths had been reported as of March 27, 2020. PFOF No. 3. The disease is so prolific and so lethal that the World Health Organization declared it a pandemic on March 11, 2020, and the President of the United States declared a national emergency on March 13. PFOF Nos. 5 & 10. According to the CDC, people who are 65 years old or older or who have underlying health conditions and diseases, such as chronic lung diseases, asthma, diabetes, serious heart conditions, and others that suppress immune systems like HIV/AIDS, are at higher risk of severe illness or death from COVID-19. PFOF No. 6. COVID-19 can lead patients to develop pneumonia, respiratory distress, and sepsis, which in turn can result in death. PFOF No. 7.

The witness signature requirement for mail-in absentee ballots requires voters who vote by mail to obtain an adult U.S. citizen's signature certifying that the voter cast the mail-in ballot themselves. Wis. Stat. § 6.87(4)(b)1; PFOF No. 13 (Form EL-122). Under the circumstances of the COVID-19 pandemic, which has led both the federal and Wisconsin state governments to declare emergencies and has led Governor Evers and Secretary Palm to issue Emergency Order #12, which directs Wisconsin residents to stay at home (with limited exceptions) and bans "[a]ll

public and private gatherings of any number of people that are not part of a single household or living unit," it is not safe, reasonable, or even logical to require mail-in absentee voters who live alone or lack an adult U.S. citizen living in their household to seek out and obtain a witness's signature in order for their ballots to be validly cast and counted.

Plaintiffs Sylvia Gear, Malekeh Hakami, Patricia Ginter, and Claire Whelan are U.S. citizens and eligible, registered Wisconsin voters. PFOF No. 21. Plaintiff Gear is a member of the Wisconsin Alliance. PFOF No. 26. Plaintiff Whelan is a member of the LWVWI. PFOF No. 27. Plaintiffs Gear, Hakami, and Ginter are all above the age of 65. PFOF No. 22. Plaintiffs Gear, Hakami, Ginter, and Whelan all have underlying health conditions that, according to the CDC, put them at an increased risk of severe illness or death from COVID-19. PFOF Nos. 6 & 23. Plaintiffs Gear, Hakami, Ginter, and Whelan each live on their own. PFOF No. 24. They reasonably believe that finding someone to witness and sign their ballots will expose them to contracting COVID-19, and with it, severe illness or even death. PFOF Nos. 28–31. As is made clear by the CDC's recommendations and Wisconsin's Emergency Order #12, Plaintiffs cannot obtain a witness signature requirement on their mail-in absentee ballots without seriously jeopardizing their health and life through possible exposure to the novel coronavirus that causes COVID-19. Forcing these highly vulnerable voters who live alone to take this risk in order to validly vote imposes a severe burden on their voting rights.

Continuing to require a witness signature on a mail-in ballot in the face of this fast-spreading pandemic lacks sufficient support from a legitimate government interest that is sufficiently "compelling" or "important," *Burdick*, 504 U.S. at 434, in this context and under these circumstances, and must be enjoined. First, the witness requirement is an incredibly weak, borderline ineffectual, anti-fraud tool. Anyone dumb and immoral enough to willfully cast a

7

fraudulent absentee ballot will be committing perjury in signing the *voter* certification. Such a determined fraudulent voter will not be deterred by the separate *witness* certification; they will simply sign a different name in different handwriting. Thirty-nine states and D.C. have concluded that there is no need for such a witnessing requirement that applies to *all* mail-in absentee voters, not just the ones that receive assistance, and do not have such a law. *Cf.* Ala. Code §§ 17-9-30(b), 17-11-7, 17-11-10; Alaska Stat. § 15.20.030; La. Stat. Ann. § 18:1306(2)(a); Miss. Code Ann. §§ 23-15-627, 23-15-635, 23-15-633; Mo. Rev. Stat. §§ 115.279, 115.283, 115.295; N.C. Gen. Stat. § 163-231; Okla. Stat. tit. 26, § 14-108; 17 R.I. Gen. Laws § 17-20-23; S.C. Code Ann. §§ 7-15-220, 7-15-230; Va. Code Ann. §§ 24.2-706, 24.2-707; Wis. Stat. § 6.87(4)(b)1.

Moreover, in other contexts, the Wisconsin legislature has typically cast a dim view of third-party attestations. Indeed, in 2011, the Wisconsin Legislature enacted 2011 Wisconsin Act 23 ("Act 23"), which was advanced as a collection of purported election security measures, including the photo ID requirement. Act 23 repealed all the statutory provisions that gave registered voters the power to corroborate the residence of a fellow voter who was registering late in person at a municipal clerk's office under Wis. Stat. § 6.29 or on Election Day under Wis. Stat. § 6.55. For example, Section 29 of 2011 Wis. Act 23 amended Wis. Stat. § 6.29(2)(a) to delete the following language: "Alternatively, if the elector is unable to provide proof of residence under s. 6.34, the information contained in the registration form shall be corroborated in a statement that is signed by any other elector of the municipality and that contains the current street address of the corroborating elector. The corroborating elector shall then provide proof of residence under s. 6.34." 2011 Wis. Act 23 § 29. So-called "vouching" was repealed in Wisconsin presumably because legislators did ***not*** trust a third party's word that an individual was eligible to register and vote, ***even if the corroborating third party was standing with the voter at the polling place or in***

***the municipal clerk's office, signed a certification under penalty of law, and provided their own proof of residence***. The requirements for corroborating witnesses for voter registration were far more stringent than for a mail-in ballot witness who must simply sign a certification and write down their residential address. How could third-party witnesses be indispensable in the mail-in absentee ballot context where none of the action happens before election officials and poll workers, but wholly unreliable in the context of in-person voting, where both the voter and the corroborating witness appear before a clerk or at a polling place? Ultimately, "witnessing" has had some superficial appeal as a security measure, as it sounds formal and rigorous, but any anti-fraud interest it purports to serve soon vanishes upon inspection of the requirement. It does not and cannot achieve what it purports to achieve.

Second, even if there were a modicum of value to law enforcement in the separate witness certification, that value would be erased by the sheer number of mail-in absentee ballots cast in the state, and the number of voters who would be disenfranchised in the name of that minimum value; an unprecedented number of mail-in ballots are being requested during this pandemic. As of Friday, more than 760,000 voters had requested absentee ballots in Wisconsin, over 170,000 more than were requested during the 2018 midterm elections. PFOF Nos. 15 & 16. State and local law enforcement authorities simply cannot mine and review hundreds of thousands and, in statewide and presidential elections, millions of witness signature certifications. And, even if they did, there would be nothing to arouse suspicion from the face of the witness certification.

Third and finally, continuing to strictly enforce subsection 6.87(4)(b)1. would directly contradict the state's interest in maintaining the strict separation of people who are not family members, as manifest on every page of Emergency Order #12. PFOF No. 11. The Emergency Order's measures are intended to drastically slow the spread of COVID-19 and protect the lives of

people like Plaintiffs, who due to advanced age and chronic illnesses or other conditions are at severe risk of complications up to and including death from contracting COVID-19. PFOF Nos. 6 & 7. In this specific context, a subset of mail-in absentee voters who live alone or do not have an adult U.S. citizen in their household are truly unable to simultaneously comply with both the requirements of Emergency Order #12 and subsection 6.87(4)(b)1. The state interests animating these provisions are in direct conflict, and voters are being forced to resolve that conflict and face grim choices—put their health and life in jeopardy, or lose their right to vote.

Given the circumstances of the COVID-19 pandemic, eligible Wisconsin voters who live alone or who do not have an adult U.S. citizen living in their household cannot comply with the requirements of Wis. Stat. § 6.87(4)(b)1. and cast a mail-in absentee ballot that will count. Therefore, under these circumstances and for the duration of the pandemic and the state's emergency orders requiring voters to self-quarantine unless necessary for essential functions or emergency needs, Section 6.87(4)(b)1. now creates an undue burden on mail-in absentee voters' right to vote in violation of the First and Fourteenth Amendments to the U.S. Constitution as construed by *Anderson* and *Burdick*.

In-person voting of course is not a reasonable alternative, as that would require the individual Plaintiffs and thousands more eligible Wisconsin voters to enter a confined space with significantly more people than would be required to witness the casting of a mail-in absentee ballot and would pose an even greater risk to the voter's health and life.

For the foregoing reasons, Plaintiffs are likely to succeed on the merits of their claim that Defendants have deprived and will continue to deprive Plaintiffs of their rights under the First and Fourteenth Amendments to the U.S. Constitution.

### B. Absent relief from this Court, Plaintiffs are certain to suffer irreparable harm because there is no way to regain one's right to vote after an election is held.

The Seventh Circuit has stated that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978); *see also Ezell v. City of Chicago*, 651 F.3d 684, 697-700 (7th Cir. 2011) (finding irreparable harm when plaintiffs' Second Amendment rights were likely violated). "When constitutional rights are threatened or impaired, irreparable injury is presumed. A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (citations omitted) (affirming preliminary injunction against law which imposed shorter in-person early voting period for nonmilitary Ohio voters than for military voters).

In virtually all circumstances implicating the exercise of voting rights, courts have found that the harm is irreparable because a violation of constitutional rights that implicate a voter's ability to cast a ballot cannot be redressed after the election. *Common Cause Ind.*, 327 F. Supp. 3d 1139, 1155 (S.D. Ind. 2018), *aff'd*, 937 F.3d 944 (7th Cir. 2019) ("A violation of the right to vote is presumptively an irreparable harm.") (citing *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 1440–41 (2014); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *Elrod v. Burns*, 427 U.S. 347, 373-74 & n.29 (1976) (plurality opinion); *Ezell*, 651 F.3d at 699)) (additional citations omitted); *Dillard v. Crenshaw,* 640 F. Supp. 1347, 1363 (M.D. Ala. 1986) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.").

Absent relief from this Court, Plaintiffs are certain to suffer irreparable harm because there is no way to regain one's right to vote after an election is held. Plaintiffs Sylvia Gear, Malekeh Hakami, Patricia Ginter, and Claire Whelan are U.S. citizens and eligible, registered Wisconsin voters. PFOF No. 21. Plaintiff Gear is a member of the Wisconsin Alliance, PFOF No. 26, and Plaintiff Whelan is a member of the LWVWI, PFOF No. 27. Plaintiffs Gear, Hakami, and Ginter

are all above the age of 65. PFOF No. 22. Plaintiffs Gear, Hakami, Ginter, and Whelan all have underlying health conditions that, according to the CDC, put them at an increased risk of severe illness or death from COVID-19. PFOF No. 23. Plaintiffs Gear, Hakami, Ginter, and Whelan all live on their own. PFOF No. 24. Accordingly, there is no feasible, safe way for Plaintiffs Gear, Hakami, Ginter, and Whelan to have an adult U.S. citizen witness them casting their absentee ballots and sign the certification. Doing so would run counter to the federal and state governments' mandates and recommendations, including Emergency Order #12's directives, and would seriously jeopardize Plaintiffs' health and lives. Additionally, in-person voting would present an even greater risk to their health and lives.

Once the election is held and the results are certified, the injury to these voters' constitutional rights will of course be irreparable. There is no adequate remedy at law, no damages, that can make a disenfranchised voter whole. In addition, the LWVWI and the Wisconsin Alliance will both be irreparably harmed because their members will be disenfranchised, *see* PFOF Nos. 26 & 27, and because both organizations have diverted resources to try to assist voters with voting absentee under these circumstances, including related to addressing the witness requirement, *see* PFOF Nos. 35-37 & 42-44.

**C. The balance of hardships militates strongly in favor of an injunction.**

The element involving the balance of harms comes down to a requirement that injunctive relief "must do more good than harm." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.,* 582 F.3d 721, 725 (7th Cir. 2009). The balancing requires the court "to choose the course of action that minimizes the cost of being mistaken" and "compare the potential irreparable harms faced by both parties to the suit – the irreparable harm risked by the moving party in the absence of a preliminary injunction against the irreparable harm risked by the nonmoving party if

the preliminary injunction is granted." *Girl Scouts of Manitou Council*, 549 F.3d at 1100. The balancing of harms also impacts the threshold requirement of the plaintiff's likelihood of success: "[h]ow strong a claim on the merits [must be] depends on the balance of harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Hoosier Energy*, 582 F.3d at 725. This "sliding scale" approach means that the "more likely it is that [the plaintiff] will win its case on the merits, the less the balance of harms need weigh in its favor." *Girl Scouts*, 549 F.3d at 1100.

If the court does not grant a temporary restraining order and preliminary injunction in this case, thousands of Wisconsinites isolated by the current COVID-19 crisis will be unable to cast a ballot that counts. In contrast, if the court grants an injunction, those voters will still be required to sign their ballots' voter certifications under penalty of perjury. There is little likelihood that the lack of a witness will cause more harm to Wisconsin voters and the public than the disenfranchisement that would otherwise result from the court's failure to issue an injunction. Every day that goes by without an order blocking the enforcement of the witness requirement is another day of undue burdening and uncertainty for Plaintiffs, who confront an impossible choice—taking a risk of contracting COVID-19 contrary to all federal and state public health officials' guidance in doing what Wisconsin law requires to cast a mail-in absentee ballot that will be processed and counted, or resigning themselves to the loss of their voting rights in this election.

Additionally, there will be no increased administrative burden or costs for Defendants from enjoining the witnessing requirement. If anything, the administrative burden will likely be reduced by enjoining the requirement during this ongoing public health emergency. But even if there were any additional costs or administrative burdens, the U.S. Supreme Court has explicitly stated that constitutional rights do not bend to administrative convenience and financial considerations. *See,*

*e.g., Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 218 (1986) (striking down Connecticut's closed primary law on First Amendment associational rights grounds) ("Costs of administration would likewise increase if a third major party should come into existence in Connecticut, thus requiring the State to fund a third major party primary. Additional voting machines, poll workers, and ballot materials would all be necessary under these circumstances as well. But the State could not forever protect the two existing major parties from competition solely on the ground that two major parties are all the public can afford.").

> **D. Enjoining the witnessing requirement for mail-in ballots would also advance the public's interest in maximizing eligible Wisconsin voters' participation and preventing the denial of voting rights.**

The balancing of harms also looks at the effect on nonparties and the public interest. The Seventh Circuit has stated that remedying a "continuing constitutional violation . . . certainly would serve the public interest." *Preston*, 589 F.2d at 303 n.3; *see also Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest.") (quoting *Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)). Issuing a preliminary injunction to prevent the disenfranchisement of countless mail-in absentee voters would serve the public interest by vindicating constitutional rights and ensuring that the integrity and legitimacy of Wisconsin elections is not destroyed by the unconstitutional and unconscionable failure to allow voters who are isolated due to the coronavirus pandemic to cast a ballot that counts. The public has a strong interest in the safeguarding of these individuals' fundamental voting rights. Further, the public also has a strong interest in severely restricting the spread of COVID-19. Requiring voters to leave their homes and request that neighbors, UPS or Meals on Wheels delivery personnel, or even the mailman witness the voting of their absentee ballot, physically handle the ballot, and sign it, is a recipe for spreading the contagion further in

Wisconsin. As Emergency Order #12 makes abundantly clear, Wisconsin residents should be doing everything to avoid social interaction outside their household or living unit. In order to do that, as with non-essential activities, non-essential trips, and non-essential businesses, this non-essential voting requirement that does not actually function as an effective anti-fraud measure must yield to the overwhelming importance of protecting voters' right to make their voice heard.

## CONCLUSION

If the COVID-19 pandemic had not occurred or spread with such ferocity in the United States, this challenge to Wisconsin's witnessing requirement for mail-in absentee ballots would almost certainly never have been filed. Under normal circumstances, most people are generally able to satisfy this technical requirement. But, under these extraordinary, unprecedented circumstances, in the context of a highly contagious and deadly pandemic, otherwise-banal—if useless—voting requirements are becoming severely and unduly burdensome. To be clear, Plaintiffs do not argue that Wis. Stat. § 6.87(4)(b)1. was intended to suppress the vote, that it would be necessarily unconstitutional absent the circumstances of this pandemic, or that it must be enjoined for all time. Rather, Plaintiffs narrowly argue that the U.S. Constitution requires that Wis. Stat. § 6.87(4)(b)1. be enjoined while Emergency Order #12 remains in effect—that is, while the global pandemic has triggered an emergency response from Wisconsin's government and/or has necessitated that people, especially at-risk people like Plaintiffs, strictly separate from one another.

Plaintiffs respectfully request that this Court enter a temporary restraining order and set a schedule for further briefing and a hearing on the preliminary injunction motion.

DATE: March 28, 2020                                         Respectfully submitted,

                                                                                                   /s/ Jon Sherman

Jon Sherman*
D.C. Bar No. 998271
Michelle Kanter Cohen*
D.C. Bar No. 989164
Cecilia Aguilera*
D.C. Bar No. 1617884
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 450
Washington, D.C. 20006
jsherman@fairelectionscenter.org
mkantercohen@fairelectionscenter.org
caguilera@fairelectionscenter.org
(202) 331-0114

Douglas M. Poland
State Bar No. 1055189
David P. Hollander
State Bar No. 1107233
RATHJE WOODWARD LLC
10 E Doty Street, Suite 507
Madison, WI 53703
Phone: 608-960-7430
Fax: 608-960-7460
dpoland@rathjewoodward.com
dhollander@rathjewoodward.com

Counsel for Plaintiffs

*Admitted to the U.S. District Court for the Western District of Wisconsin